Hand-Delivered

FILED
Statesville, NC

SEP 16 2026

Clerk, US District Court
Western District of NC

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

**BRITTANY KETCHIE,**

Plaintiff, Pro Se,

vs.

**LYON SERVICES CORPORATION d/b/a LYON FINANCIAL,**

Defendant.

**Civil Action No:** 5:26-cv-202-SCR

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Brittany Ketchie, proceeding pro se, brings this action against Defendant Lyon Services Corporation d/b/a Lyon Financial and alleges as follows:

## I. INTRODUCTION

**1.** This action arises from Plaintiff's approximately seven years of employment with Defendant and her termination on April 15, 2025.

**2.** Plaintiff brings claims under Title VII of the Civil Rights Act of 1964, the Equal Pay Act ("EPA"), and the Family and Medical Leave Act ("FMLA").

**3.** Plaintiff alleges that Defendant discriminated against her because of her sex and race; retaliated against her after she opposed conduct she reasonably believed constituted sex discrimination; paid her less than a male employee for substantially equal work in violation of the EPA; and interfered with her FMLA rights by failing to properly recognize, evaluate, communicate, and designate qualifying leave relating to the health condition and care of her child.

**4.** Plaintiff does not challenge Defendant's general ability to restructure its operations, change lenders, implement Salesforce, or modify its business operations. The circumstances surrounding

those changes are relevant because Defendant continued to rely on Plaintiff's institutional knowledge and managerial work, continued the Construction Department's operations, continued recruiting for Construction, and transferred substantial portions of Plaintiff's managerial responsibilities to a male employee after terminating Plaintiff.

**5.** Plaintiff seeks the relief permitted by law for the violations alleged herein.

## II. JURISDICTION AND VENUE

**6.** This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including Title VII, the Equal Pay Act, and the FMLA.

**7.** This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3).

**8.** Venue is proper in this District because a substantial part of the events giving rise to Plaintiff's claims occurred within the Western District of North Carolina and Defendant employed Plaintiff and conducted business within this District.

## III. PARTIES

**9.** Plaintiff Brittany Ketchie is a Caucasian female who resides in North Carolina.

**10.** Defendant Lyon Services Corporation d/b/a Lyon Financial is an employer covered by the federal statutes asserted herein.

**11.** Defendant employed Plaintiff from approximately January 2, 2018, through April 15, 2025.

**12.** At the time of her termination, Plaintiff held the position of Senior Construction Manager.

**13.** Richard "Dick" Lyon was Defendant's Chief Executive Officer and was involved in matters relevant to Plaintiff's employment and termination.

**14.** Gina Jernigan was Defendant's President during the relevant period and participated in matters relevant to Plaintiff's employment, management responsibilities, and termination.

## IV. ADMINISTRATIVE EXHAUSTION

**15.** Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2025-04510, on August 19, 2025, asserting claims including race and sex discrimination and retaliation under Title VII.

**16.** Plaintiff's claims under the Equal Pay Act and the Family and Medical Leave Act arise from conduct occurring during her employment and are brought under those federal statutes independently of the Title VII claims presented to the EEOC.

**17.** Defendant submitted a Position Statement to the EEOC dated February 16, 2026.

**18.** The EEOC issued its Determination and Notice of Right to Sue on July 22, 2026.

**19.** Plaintiff files this action within the applicable period following receipt of her Notice of Right to Sue. Plaintiff's Title VII claims are based on matters presented to the EEOC, and her EPA and FMLA claims arise under separate federal statutes.

## V. FACTUAL ALLEGATIONS

### A. Plaintiff's Employment, Responsibilities, and Performance

**20.** Defendant hired Plaintiff on January 2, 2018.

**21.** Plaintiff became Contracts Manager in May 2021 and became Senior Construction Manager approximately in July 2021.

**22.** Plaintiff remained employed by Defendant for approximately seven years, until April 15, 2025.

**23.** During her employment, Plaintiff developed substantial institutional knowledge concerning construction contracts, stage review, funding, customer and builder disputes, escalated files, Defendant's systems and procedures, workflow, training, and departmental management.

**24.** As Senior Construction Manager, Plaintiff supervised approximately 12 employees and was responsible for workloads and projects, construction files, funding and operational matters, customer and builder issues, errors and problem-solving, employee training, workflow, overtime administration and communications, escalations, and the exercise of independent judgment.

**25.** Plaintiff's position therefore involved both managerial responsibilities and substantive Construction work.

**26.** Plaintiff worked with complex construction-financing files and handled project follow-up, funding issues, customer and builder disputes, workflow problems, construction follow-up, operational issues, systems and procedures, and escalated matters.

**27.** Plaintiff successfully performed these responsibilities, including her earlier Contracts work and her subsequent Construction management responsibilities, for approximately seven years.

**28.** Plaintiff did not receive a formal written disciplinary or performance warning immediately preceding her termination.

**29.** Defendant did not identify a specific performance deficiency as the reason for terminating Plaintiff on April 15, 2025.

**30.** On July 19, 2024, Dick Lyon praised the Construction employees as "guardians of the company," described them as "critical to our ongoing success," and stated that they had an "enormous effect" on Defendant's reputation with lenders.

**B. Defendant's Knowledge of Plaintiff's Need for Leave to Care for Her Child**

**31.** Defendant's EEOC Position Statement states that, "in or around November of 2020," Plaintiff informed Defendant that her child had been born early and required special medical treatment.

**32.** Plaintiff's child required substantial ongoing care and assistance including recurring therapy appointments, generally approximately three to five appointments per week, as well as specialist appointments, surgeries, treatment, and other medical care.

**33.** Plaintiff therefore periodically needed time away from work to attend appointments and provide necessary care.

**34.** Plaintiff communicated to Defendant the reasons for her absences and her need for time away.

**35.** Defendant's EEOC Position Statement acknowledged that Plaintiff requested time off "at various times thereafter during her employment" and stated that Lyon "continuously supported" Plaintiff's care for her child.

**36.** Plaintiff's need for time away was recurring rather than isolated.

**37.** Plaintiff's need for such care continued for more than twelve months.

**38.** Plaintiff was an eligible employee for purposes of the FMLA because she had worked for Defendant for more than twelve months, had worked at least 1,250 hours during the preceding twelve-month period, and worked at a site where Defendant employed at least 50 employees within 75 miles.

**39.** Defendant had actual knowledge of the child's medical needs no later than November 2020 and knew that Plaintiff periodically needed time away from work because of those needs.

**40.** Despite that knowledge, Defendant did not advise Plaintiff of her potential FMLA eligibility or provide the required FMLA rights and responsibilities information.

**41.** Defendant did not properly evaluate or designate Plaintiff's qualifying absences as intermittent FMLA leave.

**42.** Defendant did not properly communicate with Plaintiff regarding her eligibility for FMLA leave, her rights and responsibilities, or the designation of qualifying leave.

**43.** Instead, Defendant treated Plaintiff's absences as ordinary PTO or vacation.

**44.** As a result, Plaintiff's PTO was depleted, her available ability to take time away was reduced, and she feared employment consequences from taking additional time away, causing her to miss or avoid needed care and appointments.

**C. Compensation and Male Construction Employee Mike Pringnitz**

**45.** Mike Pringnitz was a male Construction employee during the relevant period.

**46.** Plaintiff and Pringnitz performed substantially similar substantive Construction work, including project follow-up, customer and contractor disputes, escalated files, procedures, problem-solving, evaluation, communication, and the exercise of independent judgment.

**47.** Plaintiff additionally supervised approximately 12 employees and carried managerial responsibility for Construction operations, employee training, workflow, and escalated matters.

**48.** Defendant maintained a companywide funding bonus program.

**49.** The funding bonus program was not limited to Construction managers and was available to employees in other departments, including employees answering phones.

**50.** The funding bonus was tied to funded production. Funding could occur at different stages of the loan process, with Stage 1 being a typical funding stage. The resulting bonus compensation was paid through Defendant's monthly bonus process rather than immediately when a loan funded.

**51.** Plaintiff's work contributed to the production generating these bonuses through her work on active files, funding stages, escalations, disputes, follow-up, operational problem-solving, procedures, evaluation, communication, and exercise of independent judgment.

**52.** Pringnitz performed similar substantive Construction work under the same general bonus program; his compensation was not based on an individually generated pool consisting solely of his own files.

**53.** Plaintiff and Pringnitz were therefore compensated under the same general funding-bonus program but under materially different formulas.

**54.** Pringnitz received monthly bonuses approximately 30% to 50% greater than Plaintiff's monthly bonuses depending on the month.

**55.** Under Defendant's general funding structure, a standard amount paid to employees was approximately $4 per funded unit after one year and approximately $5 after five years. Pringnitz, however, was compensated on a percentage of funded dollars rather than each unit.

**56.** Defendant generally paid managers greater bonus compensation.

**57.** Pringnitz, however, had been out of management for more than seven years.

**58.** Defendant later told the EEOC that Pringnitz was "paid slightly more" than Plaintiff because he had been employed by Lyon for longer than Plaintiff and his pay was based on a preexisting compensation structure that existed before Plaintiff was hired. Defendant also asserted that Pringnitz was not a proper comparator because he occupied a different position.

**59.** Kara Saunders, a female employee with longer tenure than Pringnitz, also did not receive the same percentage-based formula as Pringnitz.

**60.** The relevant compensation disparity concerns the monthly bonus formula and bonus compensation rather than hourly wages.

**61.** Plaintiff reviewed and approved the monthly bonus compensation for employees within her department, while Pringnitz's compensation was excluded from Plaintiff's ordinary supervisory approval process.

**62.** Plaintiff alleges that the disparity was not explained by seniority, merit, quantity or quality of production, or another legitimate factor unrelated to sex.

**D. Sex-Related Management and Advancement Circumstances**

**63.** In February 2025, Jernigan stated that she wanted to hire more males because she believed males would help reduce workplace drama.

**64.** During this period, Jernigan increasingly involved male employees Tres Rogers and Ty Jackson in matters concerning Plaintiff's department and managerial responsibilities, including matters that had previously been within Plaintiff's authority.

**65.** Rogers had previously received a disciplinary write-up while working under Plaintiff.

**66.** Nevertheless, Rogers was promoted to Assistant Construction Manager on or about February 17, 2025.

**67.** Plaintiff was instructed to train Rogers concerning Defendant's operations, procedures, workflow, systems, personnel, and management responsibilities.

**68.** Plaintiff had observed performance and attendance concerns involving Jackson over a period of years, including refusal to work required overtime, lateness, and difficulty managing workload.

**69.** Multiple managers had requested that Jackson be terminated.

**70.** Dick Lyon nevertheless intervened to retain Jackson and continued transferring him from departments, and Jackson was given a newly created management position during early 2025.

**71.** At the same time, Plaintiff's managerial authority was increasingly diminished.

**E. Treatment of Jeffrey Little**

**72.** Jeffrey Little, an African American male, was assigned to Plaintiff's team after being hired by Jernigan in March 2025.

**73.** On March 26, 2025, Plaintiff asked Jernigan about Little's availability and employment documentation.

**74.** Jernigan stated that the matter had not been discussed and that she was unaware of it.

**75.** Nevertheless, Jernigan sought input from Rogers concerning Little.

**76.** Plaintiff advised that Rogers needed to be brought up to speed concerning Little.

**77.** Human Resources sought to terminate Little after Donna Denardo observed him outside the HR window, making personal calls and walking around while on the clock.

**78.** Jernigan and Dick Lyon nevertheless intervened and retained Little.

**F. Plaintiff's February 18, 2025 Protected Complaint**

**79.** By February 2025, Plaintiff had become concerned that her managerial authority was being diminished and that Rogers was being positioned to assume her role.

**80.** Approximately eight weeks before Plaintiff's termination, Dick Lyon met with Plaintiff and her sister, Crystal, and stated that Assistant Managers were intended to alleviate workload rather than replace the managers.

**81.** Dick Lyon reassured both Plaintiff and Crystal that the assistants were only to alleviate the substantial workload.

**82.** Rogers was promoted on or about February 17, 2025, and Ashley Rucker was also promoted to Assistant Manager around the same time. Both received pay increases without being required to complete the ninety-day probationary period Plaintiff and Crystal had been required to complete before receiving comparable increases.

**83.** On February 18, 2025, Plaintiff requested a meeting with Jernigan.

**84.** During that meeting, Plaintiff reported that she was being targeted.

**85.** Plaintiff reported that peer managers were attempting to "take [Plaintiff] out" so that Rogers could assume her role.

**86.** Plaintiff also reported that she had been told Rogers would take over and that there would be no need for Plaintiff.

**87.** Plaintiff explained that these circumstances were affecting her team and causing her concern that she would lose her position.

**88.** Some of the information Plaintiff reported had been communicated to her by other employees rather than personally observed by Plaintiff.

**89.** Emma Lloyd and Kara Saunders provided information concerning the alleged efforts to remove Plaintiff.

**90.** Jaselyn Hogue reported overhearing Alexah and Tenneill discussing matters concerning Plaintiff while on Tenneill's team.

**91.** Plaintiff separately reported the circumstances to Dick Lyon by telephone.

**92.** Plaintiff made these reports because she reasonably believed that the targeting of her and the proposed positioning of a male employee to assume her role were discriminatory because of her sex and violated Title VII.

**93.** Jernigan and Dick Lyon reassured Plaintiff that her position was secure and that she had nothing to worry about.

**G. Conduct After Plaintiff's Complaint**

**94.** Following Plaintiff's complaint, Defendant continued to require Plaintiff to train Rogers.

**95.** On February 28, 2025, Jernigan communicated with Plaintiff regarding the stage review department and stated that she was "not totally opposed" to rolling the function under Plaintiff, while directing continued assistance and weekly reporting.

**96.** On March 12, 2025, Dick Lyon told Rogers to obtain information from Plaintiff, Gina Jernigan, and Dick Lyon concerning Construction matters.

**97.** This instruction reflected Defendant's continuing expectation that Rogers would rely on Plaintiff's knowledge.

**98.** Defendant continued assigning Plaintiff substantive Construction work and relying on her institutional knowledge through March and early April 2025.

**99.** On March 28, 2025, Plaintiff communicated concerns affecting the Construction Department.

**100.** Jernigan forwarded Plaintiff's email concerning these matters to Jackson, a male employee who was not within Plaintiff's chain of command.

**101.** Jernigan stated that she wanted to review matters with Ty and that Plaintiff's input would be "valued and appreciated" concerning September changes.

**102.** On March 31, 2025, Jernigan told Plaintiff, "We have resumes coming in regularly, so I am on the look out to find some good people for you."

**103.** Jernigan discussed approximately 40% of applications being direct-to-consumer funding, which would temporarily reduce workload for teams later in the post-application process, but stated that Defendant would spread volume back to other lenders after restaffing.

**104.** Defendant's post-application workflow included multiple departments and stages, including conditional approval, income, final approval, contracts, stage review, and loan documents, followed by Construction after the Clear to Start was issued.

**105.** Construction files remained active and extended into thousands of files requiring continued oversight.

**106.** Construction work included hands-on project management, customer and contractor communication, resolving issues and escalations, monitoring construction, disbursements and funding, employee supervision and training, and individualized operational oversight.

**107.** Salesforce primarily affected portions of the earlier workflow; the Construction Department and its continuing work were not eliminated.

**108.** Defendant later told the EEOC that Plaintiff was responsible for "overseeing construction projects from start to finish," "tracking projects to ensure that they stay on schedule," and "acting as a liaison between homeowners and contractors, among other things." Defendant stated that, as part of a company-wide restructuring in 2025, Lyon automated various tasks previously completed by employees and that "many of Ms. Ketchie's job duties were rendered obsolete due to Lyon's newly implemented software." Defendant stated that it therefore decided to eliminate Plaintiff's position and that Plaintiff was terminated as part of the company-wide restructuring. Defendant further stated that Plaintiff's position "was not filled by anyone."

**109.** Construction employees remained employed after Plaintiff's termination, Defendant continued operating Construction, and Defendant continued recruiting for Construction positions.

**110.** On March 31, Defendant was discussing restaffing, and Plaintiff's department was the largest of the seven post-application departments by employee count and active-file volume.

**111.** The other six departments continued operating, while Construction employees, files, workload, staffing, and managerial responsibilities continued as well.

**112.** On April 1 and 2, Jernigan requested outstanding loan files and JBB information from Plaintiff, which Plaintiff provided.

**113.** Jernigan told Plaintiff, "I know you are and great progress has been made over the past few months," while Plaintiff continued working as Senior Construction Manager.

**114.** Defendant continued recruiting Construction employees during this period.

**115.** On April 1 and 2, Defendant was considering two male Construction candidates, including one candidate who was a friend of Jackson.

**116.** Plaintiff was told that if Dick Lyon liked the candidates, Plaintiff would be involved.

**117.** Thus, immediately before Plaintiff's termination, Defendant continued assigning Plaintiff work, recognized her progress, sought her operational and staffing input, and relied on her institutional knowledge.

**H. Crystal's Termination**

**118.** Plaintiff's sister, Crystal, was a Caucasian female Funding Department manager.

**119.** On February 11, Crystal emailed Dick Lyon, Jernigan, and Human Resources complaining of "bullying, harassment, toxic and a hostile work environment," and stating that employees had created a group chat to "take me out."

**120.** Crystal stated that "they want my job" and that she had not previously reported the conduct because of fear of "losing my job and retaliation."

**121.** Crystal continued raising concerns on April 8.

**122.** Defendant terminated Crystal on April 9, stating that the termination was part of restructuring.

**123.** Crystal's duties were transferred to Ashley Rucker, an African American female Assistant Manager.

**124.** Plaintiff alleges that Rucker had less management experience and institutional knowledge than Crystal and had previously received a write-up.

**125.** Crystal stated that she intended to pursue an EEOC charge or legal action.

**126.** Defendant knew that Plaintiff and Crystal were sisters and both managers.

**127.** Plaintiff remained employed for approximately six days after Crystal's termination.

**128.** During that period, Plaintiff experienced increased isolation from management communications and decision-making.

**I. Plaintiff's April 15, 2025 Termination**

**129.** On April 15, Plaintiff had a personal medical appointment during her lunch period.

**130.** Plaintiff's lunch absence was authorized, and she returned to work afterward.

**131.** Approximately 30 minutes to one hour after Plaintiff returned, Ty Jackson, who was not within Plaintiff's chain of command, retrieved Plaintiff and brought her to a termination meeting attended by Dick Lyon, Jernigan, and Human Resources. Jackson remained present during the meeting.

**132.** Defendant terminated Plaintiff.

**133.** The termination meeting lasted approximately 57 seconds.

**134.** Defendant did not identify any performance deficiency.

**135.** Defendant did not tell Plaintiff that Salesforce was the reason for her termination.

**136.** Dick Lyon stated that the reason was "restructuring."

**137.** When Plaintiff explained she was baffled, Dick Lyon stated, "Well, times change."

**138.** Plaintiff was told that she would receive approximately three months of severance or payment of amounts owed and that the parties should "go our separate ways."

**139.** Plaintiff was not presented with a separation agreement and was not told that her position had been eliminated.

**140.** Plaintiff was not told that her duties had become obsolete.

**141.** Plaintiff was instructed to collect her belongings and leave.

**142.** Plaintiff packed her belongings and left within minutes.

**143.** Human Resources directed Jackson to assist Plaintiff in packing and to remain with her while she did so.

**J. Rogers Immediately Assumed Substantial Portions of Plaintiff's Role**

**144.** At approximately 4:55 p.m. on April 15, minutes after Plaintiff's termination, Dick Lyon and Jernigan met with the Construction employees.

**145.** The employees were told that Plaintiff had been terminated as part of a restructuring and that Rogers would continue handling escalated files and take over as manager.

**146.** Rogers was therefore placed in substantial portions of the managerial role that Plaintiff had reported he was being positioned to assume.

**147.** Rogers told the employees that they would "lean on one another," that "we'll do what we can," and that "we're in it together."

**148.** On April 16, Rogers told Plaintiff that he was "extremely sorry" and that "we were all shocked and did not see that coming."

**149.** Rogers also thanked Plaintiff and stated that he had enjoyed working with and learning from her.

**150.** Pringnitz texted Plaintiff that she was his "favorite manager" and expressed sympathy concerning her termination.

**151.** An employee informed Plaintiff that Dick Lyon told Pringnitz to "keep up the team morale" because Plaintiff's termination was a difficult decision.

**152.** Plaintiff's former office was subsequently cleared.

**153.** Rogers moved into Plaintiff's former office.

**154.** Rogers's title changed from Assistant Construction Manager to Senior Department Manager – Construction Department.

**155.** Rogers thereby assumed the managerial position and responsibilities formerly performed by Plaintiff.

**156.** Rogers's subsequent communications to the Construction employees demonstrate that substantial portions of Plaintiff's former role continued after her termination. In emails sent to the Construction team, Rogers addressed Construction follow-ups, follow-up processes, outstanding matters, filters, protocols, Stage Review, assignments, and other ongoing operational matters.

**157.** Those communications reflect the continued performance of Construction functions that Defendant later represented to the EEOC had been rendered obsolete by Salesforce, including functions involving the tracking and management of Construction projects, follow-up, workflow, project oversight, and related operational responsibilities.

**158.** On April 30, 2025, Rogers sent the Construction team the required overtime for the pay period. On May 5, 2025, Rogers emailed the Construction team regarding Construction follow-ups, including follow-up processes and filters, and directed employees regarding what to do.

**159.** On May 7, 2025, Rogers sent the Construction team an email regarding Stage Review and how the overall stages should be set, something Plaintiff normally handled for her team.

**160.** Defendant later represented to the EEOC that Plaintiff's "position was not filled by anyone." The continued performance of the Construction functions reflected in Rogers's communications, however, is inconsistent with the assertion that the functions comprising Plaintiff's position were eliminated or rendered obsolete.

**K. Salesforce, Lender Changes, and Defendant's Changing Explanations**

**161.** Defendant began implementing Salesforce approximately in 2024.

**162.** Plaintiff continued performing managerial and operational responsibilities after Salesforce was implemented.

**163.** Defendant also changed lenders during Plaintiff's years of employment, and Plaintiff continued performing her responsibilities through those changes.

**164.** At Plaintiff's April 15 termination meeting, Defendant did not tell Plaintiff that Salesforce or technology was the reason for her termination.

**165.** On April 17, Jernigan sent a companywide email stating that lender changes had caused restructuring and had "unfortunately led to letting a few employees go."

**166.** Jernigan also stated Defendant now has "very strong and well-run teams."

**L. Race-Related Circumstances**

**167.** Rogers, Jackson, and Little are African American males.

**168.** Rucker is an African American female.

**169.** Rucker assumed Crystal's managerial duties despite the differences in management experience, institutional knowledge, and prior disciplinary history alleged above. Rucker received a pay increase without being required to complete the ninety-day period that Plaintiff and Crystal had been required to complete before receiving comparable increases.

**170.** Rogers and Rucker were advanced around the same time and received pay increases without the same ninety-day requirement imposed on Plaintiff and Crystal.

**171.** Plaintiff was terminated and substantial portions of her former managerial role were transferred to Rogers, an African American male.

**172.** Rogers worked within the same department and assumed substantially similar managerial responsibilities, including management of Construction operations, escalated files, workflow, employee direction, overtime administration and communications, and Stage Review.

**173.** Dick Lyon and Jernigan were among the senior decisionmakers involved in Plaintiff's termination and in the treatment and advancement of the African American employees described above.

**M. Defendant's EEOC Position Statement**

**174.** Defendant acknowledged that it knew of Plaintiff's child's medical needs beginning in approximately November 2020 and acknowledged Plaintiff's requests for time away thereafter.

**175.** Defendant did not identify a performance deficiency as the reason for Plaintiff's termination.

**176.** Defendant later told the EEOC that Plaintiff's position was eliminated as part of a company-wide restructuring based on the automation of various tasks previously completed by employees.

**177.** Defendant also represented that Plaintiff "never complained of discrimination."

**178.** Plaintiff, however, complained to Jernigan and Dick Lyon on February 18, 2025, that she was being targeted and that Rogers was being positioned to assume her role.

**179.** Jernigan and Dick Lyon therefore knew of Plaintiff's complaint and participated in the events leading to her termination.

**180.** Defendant's statement that Plaintiff "never complained of discrimination" is inconsistent with the February 18 complaint described above.

**181.** Defendant's statement that Plaintiff's position was "not filled by anyone" is inconsistent with Rogers's immediate assumption of substantial portions of Plaintiff's managerial responsibilities, his move into Plaintiff's former office, his change in title to Senior Department

Manager – Construction Department, and his continued performance of Construction management functions.

## VI. COUNTS

### COUNT I

### SEX DISCRIMINATION IN VIOLATION OF TITLE VII

**182.** Plaintiff incorporates Paragraphs 1 through 181 as if fully set forth herein.

**183.** Plaintiff was qualified for her position, successfully performed her duties for approximately seven years, served as Senior Construction Manager, supervised approximately 12 employees, and possessed substantial institutional and managerial knowledge concerning Defendant's Construction operations.

**184.** The facts alleged above support a plausible inference that Plaintiff's sex was a motivating factor in Defendant's treatment of her. Plaintiff and male employee Mike Pringnitz performed substantially similar Construction work, including project follow-up, customer and contractor disputes, escalated files, procedures, problem-solving, evaluation, communication, and independent judgment, while participating in Defendant's same general companywide funding-bonus program. Pringnitz nevertheless received monthly bonuses approximately 30% to 50% greater than Plaintiff's under a materially different compensation formula. Plaintiff alleges this compensation disparity as evidence supporting her Title VII sex-discrimination claim and separately alleges the disparity as an Equal Pay Act violation in Count IV.

**185.** The sex-related circumstances further include Jernigan's statement that she wanted to hire more males because she believed males would reduce workplace drama; the increased involvement and advancement of male employees Rogers and Jackson in matters affecting Plaintiff's department; Rogers's promotion despite his prior disciplinary history; and Defendant's

direction that Plaintiff train Rogers concerning operations, procedures, workflow, systems, personnel, and management responsibilities.

**186.** After Plaintiff raised concerns regarding the treatment and positioning of Rogers, Defendant continued relying on Plaintiff's institutional knowledge and managerial work while increasing Rogers's role and diminishing Plaintiff's authority. Defendant continued assigning Plaintiff substantive Construction work, seeking her operational and staffing input, recognizing her progress, and relying upon her knowledge shortly before her termination.

**187.** Defendant terminated Plaintiff on April 15, 2025, without identifying a performance deficiency, stating only that the reason was "restructuring" and that "times change." Within minutes, Defendant directed Rogers to continue handling escalated files and take over as manager. Rogers subsequently assumed substantial portions of Plaintiff's former managerial responsibilities, moved into Plaintiff's former office, and received the title Senior Department Manager – Construction Department. Rogers had also received an immediate pay increase when Defendant promoted him to Assistant Construction Manager shortly before Plaintiff's termination, without the ninety-day requirement imposed on Plaintiff and Crystal.

**188.** Defendant's stated reasons for Plaintiff's termination, the sex-related statement by Jernigan, the different treatment and advancement of male employees, the direction that Plaintiff train Rogers, the continued reliance on Plaintiff's work and institutional knowledge immediately before termination, and the immediate transfer of substantial portions of Plaintiff's managerial responsibilities to Rogers, when considered together, support a plausible inference that Plaintiff's sex was a motivating factor in Defendant's adverse treatment and termination of Plaintiff.

**189.** Defendant's conduct violated Title VII, including 42 U.S.C. § 2000e-2(a)(1) and, to the extent applicable, § 2000e-2(m).

**COUNT II**

**RACE DISCRIMINATION IN VIOLATION OF TITLE VII**

**190.** Plaintiff incorporates by reference paragraphs 1 through 189 as if fully set forth herein.

**191.** Plaintiff is Caucasian, was qualified for her position, successfully performed her duties for approximately seven years, and possessed substantial institutional and managerial knowledge concerning Defendant's Construction Department.

**192.** Rogers, an African American male, was promoted to Assistant Construction Manager shortly before Plaintiff's termination, and Plaintiff was directed to train him. Plaintiff had specifically reported to Defendant's decisionmakers that Rogers was being positioned to assume her role.

**193.** Fifty-six days after Plaintiff's complaint, Defendant terminated Plaintiff without identifying a performance deficiency and, immediately thereafter, transferred substantial portions of Plaintiff's former managerial responsibilities to Rogers, who had been promoted to Assistant Construction Manager shortly before Plaintiff's termination and received an immediate pay increase with that promotion. Rogers subsequently assumed substantial portions of Plaintiff's former duties, moved into Plaintiff's former office, and received the title Senior Department Manager – Construction Department.

**194.** Defendant nevertheless represented to the EEOC that Plaintiff's position was eliminated and "was not filled by anyone," while the Construction Department continued operating and Rogers assumed substantial managerial functions formerly performed by Plaintiff.

**195.** Defendant also retained and advanced African American employees Ty Jackson and Jeffrey Little despite performance or conduct concerns, and assigned substantial portions of Caucasian

female Funding Manager Crystal's former responsibilities to African American female Assistant Manager Ashley Rucker after Crystal's termination.

**196.** The treatment of Rogers, Jackson, Little, and Rucker, together with the involvement of the same senior decisionmakers in Plaintiff's termination and those employment decisions, provides additional circumstances supporting an inference of race discrimination. Defendant's stated restructuring explanation, the continued Construction operations, and Rogers's immediate assumption of substantial portions of Plaintiff's former role further support an inference that Defendant's stated reason was not the sole reason for Plaintiff's termination.

**197.** Defendant discriminated against Plaintiff because of her race in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), and, to the extent applicable, § 2000e-2(m).

**COUNT III**

**RETALIATION IN VIOLATION OF TITLE VII**

**198.** Plaintiff incorporates Paragraphs 1 through 197 as if fully set forth herein.

**199.** On February 18, 2025, Plaintiff engaged in protected activity when she reported to Jernigan and Dick Lyon that she was being targeted and pushed out, that peer managers were attempting to "take [Plaintiff] out" so that Rogers could assume her role, and that Rogers was being positioned to take over her position. Plaintiff made the complaint because she reasonably believed that the treatment directed toward her and the positioning of a male employee to assume her role were discriminatory and violated Title VII. Jernigan and Dick Lyon received the complaint and reassured Plaintiff that her position was secure.

**200.** Defendant thereafter continued to require Plaintiff to train Rogers, instructed Rogers to obtain information from Plaintiff concerning Construction matters, continued assigning Plaintiff substantive Construction work, relied on Plaintiff's institutional knowledge, sought Plaintiff's

operational and staffing input, recognized her progress, and continued involving her in Construction staffing and management shortly before her termination.

**201.** Defendant nevertheless terminated Plaintiff approximately 56 days after her protected complaint. Defendant did not identify a performance deficiency and did not tell Plaintiff that Salesforce was the reason for her termination. Dick Lyon instead stated "restructuring" and, when Plaintiff expressed confusion, stated, "Well, times change."

**202.** Immediately after Plaintiff's termination, Defendant told Construction employees that Rogers would continue handling escalated files and take over as manager. Rogers subsequently assumed substantial portions of Plaintiff's former managerial role, moved into Plaintiff's former office, and received the title Senior Department Manager – Construction Department. Rogers had also received an immediate pay increase when Defendant promoted him to Assistant Construction Manager shortly before Plaintiff's termination.

**203.** Defendant later represented to the EEOC that Plaintiff "never complained of discrimination," despite the February 18 complaint to Jernigan and Dick Lyon, and that Plaintiff's position "was not filled by anyone," despite Rogers's immediate assumption of substantial portions of Plaintiff's former managerial responsibilities. Defendant also relied on restructuring and software-related explanations that were not communicated to Plaintiff as the reason for her termination.

**204.** The close temporal proximity between Plaintiff's protected complaint and termination, Defendant's knowledge of the complaint, the continued reliance on Plaintiff after the complaint, the continued positioning and advancement of Rogers, the immediate transfer of substantial managerial responsibilities to Rogers following Plaintiff's termination, and Defendant's

inconsistent explanations and subsequent representations support a plausible inference that Plaintiff's protected activity was a but-for cause of her termination.

**205.** Defendant's conduct violated 42 U.S.C. § 2000e-3(a).

**COUNT IV**

**EQUAL PAY ACT**

**206.** Plaintiff incorporates by reference paragraphs 1 through 205 as if fully set forth herein.

**207.** Plaintiff and Mike Pringnitz performed substantially equal substantive Construction work requiring substantially equal skill, effort, and responsibility under similar working conditions, including project follow-up, customer and contractor disputes, escalated files, procedures, problem-solving, evaluation, communication, and independent judgment.

**208.** Plaintiff was paid under a fixed-dollar bonus formula, while Pringnitz was paid under a percentage-of-funded-dollars formula and received approximately 30–50% greater monthly bonuses.

**209.** Plaintiff additionally supervised approximately twelve employees and managed Construction operations, training, workflow, and escalations, while Pringnitz had been out of management for more than seven years.

**210.** Defendant's explanation that Pringnitz's compensation resulted from longer employment and a preexisting compensation structure does not, as alleged, explain the disparity because Plaintiff performed substantially equal substantive work and, in material respects, had greater managerial responsibilities. A female employee with longer tenure than Pringnitz did not receive the same percentage formula.

**211.** The disparity was not based on seniority, merit, quantity or quality of production, or another factor other than sex.

**212.** Defendant knowingly maintained and paid the differing compensation formulas despite Plaintiff's responsibility for reviewing and approving department bonuses and Pringnitz's exclusion from ordinary supervisory approval.

**213.** Defendant therefore violated the Equal Pay Act, 29 U.S.C. § 206(d)(1), and Plaintiff seeks unpaid compensation, an equal amount in liquidated damages, and recovery for the three-year period applicable to a willful violation, to the extent supported by the evidence and permitted by law.

**COUNT V**

**FMLA INTERFERENCE**

**214.** Plaintiff incorporates Paragraphs 1 through 213 as if fully set forth herein.

**215.** Plaintiff was eligible for FMLA protection because she had been employed by Defendant for more than twelve months, had worked at least 1,250 hours during the preceding twelve-month period, and worked at a location where Defendant employed at least 50 employees within 75 miles. Defendant was an FMLA-covered employer.

**216.** Plaintiff's child required ongoing medical treatment and substantial care, including recurring therapy, specialist appointments, surgeries, and other treatment. Defendant knew of these medical needs no later than November 2020.

**217.** Plaintiff had a recurring and intermittent need for time away from work to provide care and repeatedly communicated that need to Defendant. Defendant's EEOC Position Statement acknowledged its knowledge of the child's medical needs and Plaintiff's requests for time away. Plaintiff's communications provided Defendant with information sufficient to understand that her absences could be related to an FMLA-qualifying medical condition.

**218.** Once Defendant knew that Plaintiff's need for time away could qualify for FMLA protection, Defendant was required to address Plaintiff's FMLA eligibility and rights and responsibilities and, once it had sufficient information to determine whether the leave qualified, to designate qualifying leave as FMLA leave or notify Plaintiff that it was not qualifying. Instead, Defendant did not properly advise Plaintiff of her FMLA eligibility or rights and responsibilities, did not properly evaluate or designate qualifying absences as FMLA leave, and treated qualifying absences as ordinary PTO or vacation.

**219.** Defendant's treatment caused Plaintiff's PTO to be depleted and reduced her ability to take additional time away from work. Plaintiff further alleges that, because Defendant treated qualifying absences as ordinary PTO and did not provide FMLA protections, she feared employment consequences from taking additional time away and consequently missed or avoided needed medical care and appointments.

**220.** Defendant's failure to provide required FMLA notices, evaluate and designate qualifying leave, and provide the protections associated with FMLA leave interfered with Plaintiff's exercise of FMLA rights and caused actual prejudice. Plaintiff lost the benefit of protected leave, depleted PTO that otherwise could have remained available, and altered or avoided necessary leave and medical care because Defendant did not provide the protections to which she was entitled.

**221.** Defendant's conduct violated 29 U.S.C. § 2615(a)(1), and Plaintiff seeks the damages, benefits, equitable relief, and other remedies available under the FMLA.

**VII. DAMAGES AND RELIEF**

**222.** As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered economic and other legally compensable losses.

**223.** Plaintiff seeks the damages and other relief available under the statutes asserted herein, as specifically requested in the Prayer for Relief below.

**VIII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and:

**A.** Enter judgment in favor of Plaintiff and against Defendant, declaring that Defendant violated Title VII, the Equal Pay Act, and the FMLA as alleged herein;

**B.** Award Plaintiff back pay, front pay, lost wages, lost compensation, lost bonuses, lost benefits, and other economic damages;

**C.** Award Plaintiff unpaid compensation under the Equal Pay Act, an equal amount in liquidated damages, and compensation for the three-year period applicable to a willful violation, to the extent permitted by law;

**D.** Award Plaintiff all damages available under the FMLA;

**E.** Award Plaintiff compensatory and punitive damages under Title VII to the extent permitted by law;

**F.** Award equitable relief, including reinstatement or front pay where appropriate, correction of employment records, and any other equitable relief the Court deems appropriate;

**G.** Award prejudgment and post-judgment interest as permitted by law;

**H.** Award costs and other expenses recoverable under applicable law; and

**I.** Award such other and further relief as the Court deems just and proper.

**IX. DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

This is the 15th day of September 2026.

Brittany Ketchie

**Brittany Ketchie**
**Plaintiff, Pro Se**
240 Maple St
Salisbury, NC 28146
704-431-5014
brittnheath@gmail.com